The first case that is calendared is number 20-3555 in Re 461 7th Avenue Market, Inc. So we have Mr. Kim for the appellant and Mr. Savino, are you available by screen? Yes, do I show your honor? I should be showing. Yes, yeah, I see you now. Very good. Everyone, my colleagues? Yeah. Okay, very good. All right, Mr. Kim, please proceed. Good morning, your honors. May it please the court. I am obliged to point out from the outset that we overlooked a case that may be binding, and I'm obliged to cite that case. It's Imre Guzan Restaurant Corporation, GUSAN, 737 Fed 2nd 274. It's a 1984 case. I don't know why two lawyers at my firm, including myself, missed that, but we did. I'm not aware that anybody else has discussed that case either. The questions before this court are very narrow. Does the court recognize a debtor or a debtor in possession to have the ability to challenge an order that displaced a Chapter 11 reorganization process that was successfully going without the bankruptcy court after concealing the 16 factors under 1112B of the bankruptcy code? We, of course, maintain that that should not happen. Mr. Kim, you had the window right before the trustee was appointed to challenge the district court's conversion order, right? We certainly did, and that's not the only window that's permitted. And the reason is because once the Chapter 7 trustee is installed, the Chapter 7 trustee has a vested interest in managing the Chapter 7 corpus. Even so, even so, we have held on numerous occasions that the appointment of the trustee divests the debtor in possession of authority to litigate. Generally, as a matter of management principle, Your Honor is correct. And the Chapter 7 trustee steps into the shoes of the debtor. That's not the case with the debtor in possession. What's your authority for that proposition? We really don't have a specific authority on that point because it's kind of lacking, but the case that I cited- But that would have occurred in numerous occasions where the trustee was appointed. And it was striking to me that there was no authority for the proposition that the window stays open, that the debtor is, or the former debtor, retains the authority to go ahead and challenge the conversion order. Your Honor, on that issue, the bankruptcy code talks about the debtor's rights and obligations versus the debtor in possessions' rights and duties. Sections 1104, 1107, for example, talk about the DIP encompassing both, but it's really the role of the trustee. The Chapter 11 trustee that the debtor and debtor in possession executes- But would you agree that there's no statutory or case law authority for the proposition that you're propounding? Not directly on point, Your Honor, but the 1984 case that we cite does recognize that the debtor's appeal was reversed and remanded. We think that by implication, standing cannot really be questioned because it's not something that would automatically pass to the Chapter 7 trustee. If it were- Let me ask a different question, if I could. Are we in agreement that standing that we're talking about here is not Article 3 standing, but authority to sue, to challenge, or to appeal- I would agree with that, Your Honor. But as a practical matter, the question of standing relates to who has the right and perhaps the responsibility to speak on behalf of the Chapter 11 estate. Chapter 7 trustee cannot. The reason is the Chapter 7 trustee has a vested financial interest in having the Chapter 7 play out. So we're not talking about a jurisdictional challenge. I have another jurisdictional question for you, which has to do with mootness. I understand that the trustee, who's now been in place for some time, has abandoned the lease and that the proceedings are ongoing in the bankruptcy court. But that there's no, I can't imagine really what relief there is that this court could grant that would solve your problem, since the lease has been abandoned. And the trustee has made reports about the absence of assets in the debtor and possessions account. And so I'm concerned about that. Sure, Your Honor. Your Honor, as we understand it, when a trustee abandons a lease, as happened here on August 27th, 2020, the rights and obligations, if any, residual rights pertaining to the lease, revert back to the debtor. But wait a second, the bankruptcy court also directed that possession be relinquished. And gave the landlord right to resume ownership and control of the property, is that correct? That's correct. And the landlord is still retaining ownership, so mootness doesn't really apply. Because mootness generally applies as a principle to stop further proceedings. When a good faith purchaser, a third party, for example, bought something from the trustee or obtained something out of the bankruptcy court, and not the original owner. The original owner still has possession and control over the leasehold interest. We're still engaged in essentially a two-party battle. So what reversionary interest would there be in the debtor and possession at this stage? That goes to the mootness question, Your Honor. But if the court grants reversal and remand on the question of the 1112B conversion, that mootness issue of the doctrine itself does not preclude us from going back, status quo ante, A-N-T-E, to re-litigate the issue with the landlord because it's not a third party. But of course, if we did find, if the case is not moot, if we agree with you it's not moot. And we found that you had standing, then we are in a position still to assess whether you've made out the four factors. The public interest, irreparable harm, and so on and so forth. Is that right? Yes, Your Honor. I have two questions, Mr. Kim. One, would Mr. Park have had standing to appeal in his own name as a person aggrieved by the order? That question seems even less settled than the core question we have before the court. We're not in need to press that issue. Well, because he didn't. Because, well, we had to protect the case as it stood in the bankruptcy court. So as not to make an unintentional mistake. And my other question is, I realize your time is running low, but could you address the likelihood of success on the merits? If this standing point is not a question of jurisdiction, then it seems to me we could omit deciding that. If it turned out that on the merits, we thought that as the bankruptcy court and the district court did, it would be impossible for the debtor in possession to have a satisfactory plan, since there were no assets available sufficient to deal with the Department of Buildings order. So what do you have to say on that subject? The question of what the deal- Please take your time to respond to that. Thank you, thank you, Your Honor. The question of what the deal will be ordered is in itself a disputed fact. The June 5, 2020 email from John Rain, the new building commissioner of Manhattan, was not a determination, flat out simple. A determination requires a stamp and seal of DOB. That was an advisory- Yes, but we're talking about the likelihood of success, right? This is an appeal seeking a stay. It's not on the merits of what the ultimate outcome of the case is. That hasn't been addressed by the district court. Yes, sir. So does that not, are you disputing that that statement from the commissioner would be something we should take into account in deciding whether it's likely that it would be possible to salvage this business? The panel should disregard anything John Rain said, because the crux of the bankruptcy court's decision was based upon that advisory email and not on 1112B. 1112B has 16 subparts. They're not 16 things that all have to be weighed and balanced. Not at all. There's 16 examples of situations in which the bankruptcy court can act, and the bankruptcy judge didn't have to get past the first one before deciding that, yeah, that one applies. That was what the ruling was, isn't it? The fairness calls for a fair hearing in advance of that. The 1984 cases we disclosed today was reversed on the basis of the court acting sua sponte in the bankruptcy court. Wait, wait, wait, wait, wait, wait, wait. The bankruptcy court did not act sua sponte. There was a motion by the creditor, right? The motion was returnable on the very day that the bankruptcy judge acted, and that was a date on which the, there was a previously scheduled conference to deal with various matters, and there it was. That's presumably why the creditor picked that date as a return date. It was fully briefed, and the issue was fully briefed by your side as well. Your Honor, that return date, as a matter of local rules, is not the return date for a hearing. That day, July 9, 2020, was carved out specifically for a Zoom trial involving 16 participants, including several witnesses. We were not there to address that dormant issue. And so you're saying that it was totally unfair and surprising to you that the bankruptcy judge took up a motion that had been fully briefed, and which was the return date was a date stated, and it was the date that everyone was going to be there anyway, and the bankruptcy judge says, well, how about we decide this? We gave you an opportunity or your predecessor an opportunity to argue the point. So what is missing there? What is unfair about that? It was unfair, and there was no evidentiary hearing. Why does there need to be an evidentiary hearing? The reason is the facts were diametrically opposed, and the question of whether that June 5, 2020 email from John Rain was or was not a determination was pivotal to whether or not we would incur any cost in fixing any of the alleged defects that the landlord created after it bought into that building. Okay, I understand your point. And so those facts should have played out in a fair and orderly evidentiary hearing. Lack of that is what the troublesome nature of the bankruptcy court's judgment was. Thank you. Thank you, Mr. Kim. You've reserved two minutes for rebuttal. Thank you, Your Honors. May it please the court, I'm William Savino, and thank you for allowing me to appear remotely. I'm in Buffalo, and I'm 70 years old and didn't want to travel. Your Honor, obviously, I've not had an opportunity to read Mr. Kim's new citation, but just knowing the year of the citation, 1984, is very important, because the key citation driving the whole doctrine of the ouster of management of the debtor is the Supreme Court decision the next year, 1985, in Commodity Futures v. Weintraub. So whatever came before that landmark decision that's universally cited, basically loses its authority. So I just wanted to note that at the outset. Mr. Savino, could you please address whether this action is moot at this point, given the trustee's abandonment? We absolutely believe it's moot. There were no operations at the time of the conversion, as is in the record. All that was there was rotting vegetation. The premises were surrendered to the landlord by the order of Judge Drake. And what about the kind of reversionary interest in the lease that Mr. Kim was mentioning? There is no reversionary interest for multiple reasons. One, the order of Judge Drake saying whatever lease there was, was abandoned to the landlord, surrendered, excuse me, surrendered to the landlord. Secondly, the trustee, the sole party with power to assume or reject, surrendered the lease to the landlord. But lastly, as we note in our brief, when the Yellowstone injunction of O. Peter Sherwood, Justice O. Peter Sherwood, expired before the filing, that extinguished any lease whatsoever. They didn't get their Yellowstone extension. So for those three reasons, there is no reversionary interest. And let me ask your view about the question we've been calling standing, the standing of the debtor in possession to challenge the conversion order. Do you agree that that is not an Article 3 standing question, but a question of authority under the statute to appeal that order? I think it's authority under the statute, not an Article 3 issue. But speaking briefly to that, I believe my opponent doesn't draw the critical bright line between debtor and debtor in possession. When you have a conversion, you cease to be a debtor in possession. You're merely, at most, a debtor, but a debtor under the control of the trustee with management ousted, whether under CW Mining, Commodity Futures, or Quest Ventures. But let me ask you a question about that. If a trustee is appointed the day after the conversion, the debtor who may want to challenge and may have good grounds for challenging the conversion, it really doesn't have an opportunity to get appellate review of that. Here, there were several days, maybe nine days that elapsed in which one could have sought review. But my understanding is that the appointment of the trustee can happen very quickly or even contemporaneously with the conversion order. And in that case, it strikes me as unfair and maybe not what Congress would have contemplated to prevent the debtor becoming a debtor in possession to challenge it. And obviously, as your colleague points out, colleague across the aisle there points out, the trustee himself has no incentive to challenge the order that has just appointed him. So what's the way to resolve that concern? Your Honor, I wish there were name tags in front of the panel because I'm not sure which of your colleagues asked about the appeal by the principal, Mr. Park. I'm sorry. Mr. Park. Judge Lynch is to my right. It's Judge Seven here and Judge Sullivan to my left. Judge Lynch raised the question of why didn't the principal appeal? Quite honestly, I would have a very hard argument on standing had there been a timely notice of appeal by Mr. Park. And there was no appeal by him. There was no appeal from the adversary proceeding separate from the main case. And seeing that error, there was a dispute over the caption because at certain points in this appeal, the caption improperly included Mr. Park. But that ship sailed. There was a deadline and he did not appeal. So that left solely the corporate entity, which we know from C.W. Mining, 10th Circuit, can only act to its agents. And those agents were ousted, as we know from commodity futures from the Supreme Court. And though it's a lower court case, it's an Eastern District case, Quest Ventures says only trustees can appeal. So I think the standing is fatal, but I do note that Judge Helper wrote a very thorough decision where he said, arguendo, if I got to the merits, here's why I would not exercise my discretion to grant a stay. And I'm going to say the obvious to this panel. A stay is not a matter of right. It's extraordinary. It's a matter of judicial discretion. Mr. Kim bears the burden of showing the circumstances justified. The exercise of discretion. And for this panel, all it should review on this case, if it finds standing, is did Judge Helper abuses this discretion? And for all the reasons recited in his decision, I think there hasn't been an abuse of discretion. What's the prejudice to the landlord at this point? We have offers coming in on the building which can't be sold with what is now a bargain lease. At the time we briefed this, as shown by the affidavit of Mr. Shah, we had an offer for the building for $2 million more than our basis in the building. So the prejudice is basically being prevented from any disposition of the fee title. Also, this tenant isn't in a position to operate. It has no money. And having a closed premise can compound the adverse effect to the owner. This is why leases routinely include continuous operation covenants. But here, I hate to use the old expression, how do you make a cow out of hamburger? This has been converted to Chapter 7, liquidated to the extent that the cash could be given to secured predators. The equipment wasn't worth selling. And the inventory was rotting. This case is essentially poised for closure as soon as the abuse are over. And Judge Halpern, doing the rational thing, said, I'm going to wait for guidance from the Second Circuit on standing. Because if there isn't standing, I never have to address the appeal of the conversion order itself, which is not before this panel. And that's yet another order which is only reviewed on abuse of discretion standard. The only thing here, which is de novo, which is before this panel, is whether there is standing. And we submit that the one citation is from before Weintraub. And our three citations, while not on point, Second Circuit are persuasive authority that this management had no authority to pursue this appeal. Those are my points, Your Honor. I'm not sure why you say that the only question before this panel on appeal is the standing question. Because the district court, yes, found standing. But even if we were to find, or if we were to presume, as courts have before, assuming arguendo that there was standing, we wouldn't be able to address whether the grounds for a stay were made out. Isn't that correct? I did not mean to leave that impression. And if that's the impression, let me backtrack and erase it. There's the standing issue. But the other issue would be, for this panel, on the stay, was there abuse of discretion by Judge Halpern? I did not mean to disregard that. And I don't think there was abuse of discretion by Judge Halpern, if for no other reason irreparable harm has never been shown. And that's the single most important of the four prongs. Thank you. All right. I think we have your argument. We'll hear from Mr. Kim. You have two minutes of rebuttal, sir. Thank you, Your Honor. Mr. Savino's argument that we were having difficulty financially is not in record. There's nothing in the record that indicates, even hints, that the debtor had any difficulty financially. Wait, nothing hints? Between the Yellowstone order and what eventually became the motion to convert, right? Yes, sir. And the Bankruptcy Court has a long history with at least three transcripts showing that we had an evidentiary hearing, September 5, 2018. The Bankruptcy Court itself said, I've got legal issues that I need to decide, such as whether the lease required an elevator, an ADA-compliant restroom on the second floor. The Bankruptcy Court never decided those issues when it punted on July 9, 2020 to get the case out of the system. And that's not the way we want orderly proceedings to proceed. We want the courts, all courts, to do that which they said they would do, that which they are obligated to do, which is to decide issues that were teed up and that the court itself had acknowledged. And there's nothing below that says we were unable to reorganize. We had $250,000 in McPhara's trust account, specifically earmarked for the plan of reorganization. We had very little debt that was causing us pressure. This was essentially a two-party case manufactured by the landlord who wanted to eliminate the tenancy so that it could garner a higher tenancy. Were there estimates made in the record about what it would cost to comply with the Department of Buildings? There were disputed records, and the bankruptcy judge held an evidentiary hearing and screamed at Delshaw's opinion person on September 5, 2018, because their dollar values were so astronomical and absurd. And why do we even need an ADA-compliant elevator or bathroom on the second floor that's used by two staff persons in store premises that are 1,500 feet or smaller? We don't. It is excluded by the ADA. It is not required by the City of New York. And the March 2018 approval from the DOB, from then-Commissioner Rebholz, before Rain, who used to work for Delshaw, or an architect that worked for Delshaw, came in and started messing around, Rebholz's determination had the DOB stamp and seal, and we were approved. There were no violations. Thank you, Mr. Chairman. Thank you very much. Thank you very much. We have the arguments. We will reserve decision. Thank you. Thank you. Thank you, Mr. Savino.